USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______________
DATE FILED: 09/30/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAUL GIOUPIS,

Petitioner,

-against-

CAPE SECURITIES, INC., and JAMES RANDALL WEBB,

Respondents.

26-CV-208 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Now before the Court are: (1) a Petition to Confirm Arbitration Award (the Petition), filed by petitioner Paul Gioupis, seeking an order confirming a $528,795.49 arbitration award (the Award) issued in his favor on December 30, 2025 by a Financial Industry Regulatory Authority (FINRA) Dispute Resolution panel (the Panel) and entering judgment thereon, and (2) a motion to vacate the Award (Motion to Vacate), filed by respondents Cape Securities Inc. (Cape) and James Randall Webb, on the ground that the Panel manifestly disregarded the law by ignoring FINRA Rule 2040 (Rule 2040), which governs when commission payments can be made to a retired registered representative, and by failing to apply the relevant statutes of limitation. After careful review of the file, I conclude that respondents have failed to meet the high hurdle for vacating an arbitration award based on alleged errors of law. Consequently, for the reasons set forth in more detail below, the Motion to Vacate will be denied, the Petition will be granted, and judgment will be entered in petitioner's favor for the full amount of the Award, plus pre-judgment interest.

## I. BACKGROUND

### A. Procedural History

Petitioner initiated this action on January 9, 2026 by filing his Petition (Pet.) (Dkt. 1), a supporting memorandum of law (Pet. Mem.) (Dkt. 5) and the Declaration of Michael P. Gilmore (Gilmore Decl.) (Dkt. 4), with exhibits. On January 29, 2026, respondents filed their Motion to

Vacate (Dkt. 8), supported by a memorandum of law (Resp. Mem.) (Dkt. 9) and the Declaration of Michael Scott Holcomb (Holcomb Decl.) (Dkt. 10), with exhibits. On February 9, 2026, petitioner filed a memorandum in opposition to the Motion to Vacate and in further support of the Petition (Pet. Opp.) (Dkt. 14) and another Declaration of Michael P. Gilmore (2d Gilmore Decl.) (Dkt. 13), with exhibits. On February 17, 2026, respondents filed a reply memorandum (Resp. Reply) (Dkt. 17) in further support of their Motion to Vacate. That same day, the parties consented to my jurisdiction pursuant to 18 U.S.C. § 636(c). (Dkt. 15.)

On May 7, 2026, petitioner filed a motion for an order of attachment in aid of arbitration and an asset freeze (the Attachment Motion) (Dkt. 18), with supporting papers (Dkts. 20, 21). On May 21, 2026, respondents opposed the Attachment Motion (Dkts. 23, 24) and on May 27, 2026, petitioner filed his reply papers in support of that motion. (Dkts. 25-27.)

On June 10, 2026, I heard oral argument on the Petition, the Motion to Vacate, and the Attachment Motion. At the conclusion of oral argument, I granted the Attachment Motion in part,[1] and took the Petition and the Motion to Vacate under submission.

### B. Underlying Dispute

Respondent Cape was a securities broker-dealer and a member of FINRA. Pet. ¶ 2. Respondent Webb was the owner and CEO of Cape. *Id.* ¶ 3. The parties agree that petitioner was a registered representative for Cape for approximately one year, from July 2016 until July 2017. *See* Pet. ¶ 8; Resp. Mem. at 3 & n.2.

[1] I granted the attachment motion as to respondent Cape. *See* Attachment Order (Dkt. 30) at 2-3. However, petitioner never identified any assets subject to attachment in this District, and never posted the $500 bond set by the Court. I denied the attachment motion as to respondent Webb, *see* Attachment Order at 3, and denied petitioner's request for an asset freeze. *See id.* at 3-4.

Petitioner became a registered representative for Cape pursuant to an Independent Registered Representative Agreement dated July 5, 2016. *See* Holcomb Decl. Ex. K (IRRA) (Dkt. 10-11). Under the IRRA, petitioner agreed "to become registered with Cape and to execute securities transactions exclusively through it." IRRA § 1. The IRRA provided that petitioner's "sole source of compensation" would be "commissions on [his] clients' transactions, as outlined in the Commission Schedule." *Id.* § 6. It further provided that "the payment of any commissions earned shall not become due or payable until such time as Cape is in actual receipt of the commissions." *Id.* The Commission Schedule set petitioner's commission percentage at 85%, including "on shares and warrants." Holcomb Decl. Ex. L (Dkt. 10-12); *see also* Pet. ¶ 8 ("Mr. Gioupis was entitled to receive 85% of the shares of stock associated with the investment banking transaction" at issue in this case).

The IRRA further provided:

> In the event of the disability or retirement of the Representative prior to the termination of this agreement, Cape shall pay to the Representative commissions earned for business generated by the Representative and approved and accepted by Cape prior to the date of disability or retirement for two years following the date of disability or retirement, provided, however, that the Representative is no longer working in the securities business, is not associated with another FINRA-member broker-dealer, and is not statutorily disqualified from association or registration with a FINRA-member firm, and that such payments are then allowed under industry rules and regulations. At its discretion, Cape may extend this time period for another two years or portion thereof.

IRRA § 6(g).

As explained in petitioner's Statement of Claim in the underlying arbitration, petitioner introduced respondents to SignalLamp Health LLC (SignalLamp), a healthcare company that was seeking financing opportunities. *See* Gilmore Decl. Ex. 2 (Pet. Arb. St. of Claim) (Dkt. 4-2) ¶ 5. Cape then entered into a Placement Agent Agreement with SignalLamp, under which Cape was to use its best efforts to privately place a minimum of $250,000 and up to $1,500,000 of the

Company's LLC Interests in a Series A financing round. *See id.* ¶ 7; Holcomb Decl. Ex. M (PAA) (Dkt. 10-13) at 1. The PAA required SignalLamp to pay Cape both a "Cash Fee" and an "Equity Fee" for each "Financing" Cape closed. *See* PAA § 2(a).

In addition to introducing SignalLamp to Cape, petitioner "was personally responsible for successfully raising over $1,000,000 on its behalf." Pet. Arb. St. of Claim ¶ 8. The parties agree that, so long as petitioner remained associated with Cape, he received "85% of the Cash Fees" paid by SignalLamp. *Id.* ¶ 9; *see also* Resp. Mem. at 5 ("Petitioner received his proportionate share of the initial cash fees in connection with the SignalLamp Offering[.]"). However, SignalLamp did not pay any Equity Fees during this period. In July 2017, petitioner left Cape and retired from the securities industry. *See* Holcomb Decl. Ex. Q (Dkt. 10-17) (July 7, 2017 email from petitioner to Cape personnel, including respondent Webb, announcing his resignation).

The parties agree that, on January 26, 2018 (less than two years after petitioner retired), SignalLamp incorporated itself as SignalLamp Health, Inc. (SLH), and issued shares. *See* Resp. Mem. at 5; Pet. Opp. at 15. Cape received a share certificate for 209,884 Class B non-voting shares of SLH, representing the Equity Fee due to Cape under the PAA. *See* Pet. Opp. at 15; 2d Gilmore Decl. Ex. 2 (Dkt. 13-2) at ECF p. 4 (SLH share certificate to Cape). On April 20, 2018, petitioner informed Cape, via email to respondent Webb and Cape's then Compliance Officer, Mike Lovett, that he had "asked Signallamp to break up our share certificate . . . under our 85/15 split for shares." Holcomb Decl. Ex. G (Pet. Hearing Ex. Book 1) (Dkt. 10-7) at ECF p. 122. Petitioner explained that "they will need instructions," and asked Cape to write to "Drew and Andy at SLH and ask them to consummate the change of the certificate." *Id.*

On May 2, 2018, Lovett emailed "Andy" at SLH, with a copy to petitioner, writing:

> As part of our agreement with you a po[r]tion of the compensation included shares of Signallamp should a triggering event occur. We entered into this agreement

> through our former representative Paul Gioupis. As an internal agreement between Paul and Cape Securities we shared compensation on an 85/15 split with him.
>
> As Paul is no longer associated with Cape please accept this as authorization from Cape that should a triggering event occur we accept the certs to be split 85% to Paul and 15% to Cape Securities Inc.

Pet. Hearing Ex. Book 1 at ECF p. 125. On May 30, 2018, Lovett informed respondent Webb and Les Hochler of Cape that he had "contacted Signallamp with instructions authorizing the split," but that there had been "no event to date to trigger the distribution of shares[.]" *Id.* at ECF pp. 127-28. Lovett explained that the split request "was done at Gioupis' request to facilitate any future distribution which may come up." *Id.* Insofar as the record reflects, the SLH share certificate was never split.

Six years later, on May 15, 2024, SLH contacted its shareholders to inform them of "a potential merger that may culminate in the sale of the company." Pet. Hearing Ex. Book 1 at ECF p. 133. In a May 20, 2024 email to Jeff Bodner of Cape (and petitioner), SLH co-founder and CEO Drew Kearney wrote that SLH was finalizing the merger and would wire proceeds once it closed. Kearney noted that SLH was not a party to any agreement between petitioner and Cape, and asked whether Bodner could "handle the appropriate Cape distributions." Holcomb Decl. Ex. U (Dkt. 10-21). Three days later, on May 23, 2024, Kearney informed petitioner by email that his shares "will be through Cape's shares, so they [Cape] will need to wire. This can settle any side letters and your shares." Holcomb Decl. Ex. T (Dkt. 10-20).

On June 5, 2024, Bodner emailed petitioner, with copies to respondent Webb and Cathy Webb, to further update him on the SLH merger, explaining that Cape's 1.9% (209,884 shares) would result in a payout of "approximate[ly] $700,000," and that "the Lionshare [sic] will be paid to you." Pet. Hearing Ex. Book 1 at ECF p. 131. On June 20, 2024, SLH merged with a company called Accuhealth, resulting in a cash payout to Cape of $639,657. *See* 2d Gilmore Decl. Ex. 4

(Dkt. 13-4) (June 20, 2024 email from merger administrator SRS Acquiom to respondent Webb, confirming that "payment of 639,657.00 USD has been processed via the Wire instructions you provided to SRS Acquiom"); *see also* Resp. Mem. at 6 (confirming that "[i]n June 2024, [SLH] merged with Accuhealth, resulting in a cash distribution to Cape of $639,657, representing the value of the shares Cape received pursuant to the Placement Agent Agreement"). Later in 2024, two additional payments were made to Cape. *See* 2d Gilmore Decl. Ex. 2 (Dkt. 13-2) at ECF p. 3 (email from Kearney to petitioner, confirming that "Closing Payment was $639,697.00; Tax Escrow No. 1 payment was $18,240; and Tax Escrow No. 2 payment was $15,098.87.").

It is undisputed that Cape never paid petitioner 85% (or any other portion) of the cash distribution that it received in 2024 for its 209,884 SLH shares. Respondents argued to the Panel – and now argue to this Court – that Rule 2040 barred them from doing so, and that in any event petitioner filed his arbitration claims too late.

### C. The FINRA Arbitration

Petitioner initiated a FINRA arbitration on December 26, 2024 (approximately six months after the SLH merger closed), alleging breach of contract, breach of the implied covenant of good faith and fair dealing, "conversion/civil theft," and unjust enrichment, *see* Pet. Arb. St. of Claim ¶¶ 18-40, and seeking the "minimum amount" of $650,000 on each claim. *Id.* at 9. Respondents filed their answer on February 14, 2025, *see* Holcomb Decl. Ex. B (Dkt. 10-2), and on November 21, 2025, both sides submitted prehearing briefs. *See* Holcomb Decl. Ex. C (Dkt. 10-3) (petitioner); *id.* Ex. F (Dkt. 10-6) (respondents).

The arbitration hearing commenced in New York City on December 9, 2025, before a Panel of three arbitrators, all lawyers. *See* 2d Gilmore Decl. Ex. 3 (Dkt. 13-3) (Panel resumes). The hearing took place across three days: December 9 (Day 1), December 10 (Day 2), and December

11, 2025 (Day 3).[2] At the hearing, petitioner called two witnesses: himself (*see* Day 1 Tr. at 25-247) and Drew Kearney (*see* Day 2 Tr. at 6-41). Respondents called two witnesses: Webb (*see* Day 1 Tr. at 248-283; Day 2 Tr. at 42-196), and Alan Wolper, a securities lawyer, who testified as an expert witness regarding when a broker-dealer may (or may not) pay "transaction-based compensation" (commissions) to a retired registered representative in accordance with Rule 2040. *See* Day 3 Tr. at 6-120; *see also* Holcomb Decl. Ex. BB (Dkt. 10-28) (Wolper resume).

Closing arguments took place on December 11, 2025. *See* Day 3 Tr. at 124-197. Thereafter, on December 14, 2025, respondents submitted post-hearing "evidence" (in reality, a collection of legal materials) regarding the applicable statutes of limitation for all of petitioner's causes of action. *See* Holcomb Decl. ¶ 12 & Ex. HH (Dkt. 10-34).

On December 30, 2025, the FINRA panel issued its Award, *see* Gilmore Decl. Ex. 1 (Dkt. 4-1), granting petitioner $528,795.49 in compensatory damages against both respondents, jointly and severally. Award at ECF p. 3. The decision did not include the Panel's reasoning; however, the Arbitrators acknowledged that they each "read the pleadings and other materials filed by the parties" and that the Award was based on their consideration of "the pleadings, the testimony and evidence presented at the hearing, and any post-hearing submissions." *Id.*

## II. LEGAL STANDARDS

### A. Confirmation and Vacatur of Arbitration Awards

Under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq*., a federal district court "must grant" a timely petition to confirm an arbitration award, "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. "Normally, confirmation

[2] *See* Holcomb Decl. Ex. II (Day 1 Tr.) (Dkt. 10-35); *id.* Ex. JJ (Day 2 Tr.) (Dkt. 10-36); *id.* Ex. KK (Day 3 Tr.) (Dkt. 10-37).

of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court[.]" *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (cleaned up). Judicial review of arbitration awards is "severely limited, so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71-72 (2d Cir. 2012) (cleaned up). The reviewing court owes "strong deference" to "arbitral awards and the arbitral process." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 138 (2d Cir. 2007). Thus, "[t]he arbitrator's rationale for an award need not be explained, and the award should be confirmed 'if a ground for the arbitrator's decision can be inferred from the facts of the case.'" *D.H. Blair*, 462 F.3d at 110 (quoting *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)).

There are four statutory bases under § 10 of the FAA, none of which applies here.[3] In addition, the Second Circuit has held that "[a]n arbitration award may be vacated if it exhibits a 'manifest disregard of the law.'" *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002) (quoting *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997)). However, review under the manifest disregard standard remains "'highly deferential' to the arbitrators, and relief on such a claim is therefore 'rare.'" *STMicroelectronics, N. V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (quoting *Porzig*, 497 F.3d at 138). Absent a demonstration "that the panel intentionally defied the law," rather than merely failed to understand

[3] The statute allows for vacatur in four circumstances: (1) the arbitral award "was procured by corruption, fraud, or undue means;" (2) "there was evident partiality or corruption in the arbitrators;" (3) "the arbitrators were guilty of misconduct . . . by which the rights of any party have been prejudiced;" or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a).

or apply it, the court cannot vacate an award for manifest disregard of the law. *Id.* (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389, 393 (2d Cir. 2003)); *see also Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 671 (2010) ("It is not enough for petitioners to show that the panel committed an error – or even a serious error.") (citing *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)).

The "application of the manifest disregard standard involves at least three inquiries": (1) "whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators"; (2) whether "the law was in fact improperly applied, leading to an erroneous outcome"; and (3) whether the arbitrator actually knew of the law's "existence, and its applicability to the problem before him." *Duferco*, 333 F.3d at 389-90; *accord Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 121 n.1 (2d Cir. 2011). Under the first inquiry, the law must be "well-defined, explicit, and clearly applicable." *STMicroelectronics*, 648 F.3d at 79 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 934 (2d Cir.1986)). Under the second and third inquiries as noted above, it is not enough to show that the panel was aware of the law but applied it incorrectly; the moving party must show that the panel "intentionally defied the law." *STMicroelectronics*, 648 F.3d at 78; *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217 (2d Cir. 2002) (moving party must show that the arbitrator "willfully flouted" the law by refusing to apply it); *Seneca Nation of Indians v. New York*, 988 F.3d 618, 626 (2d Cir. 2021) (same). Conversely, "[o]nly 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." *Id.* (quoting *Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union*, 954 F.2d 794, 797 (2d Cir. 1992)); *accord T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010); *see also DeVary*, 2024 WL 4444280, at *6 (confirming FINRA arbitration award, notwithstanding defendant's claim that

the panel manifestly disregarded the law by requiring it to pay commissions in violation of Rule 2040, where there was "at least a 'barely colorable justification for the outcome reached'") (citation omitted). The party moving to vacate the award "has the burden of proof, and the showing required to avoid confirmation is very high." *D.H. Blair*, 462 F.3d at 110; *see also Stolt-Nielsen*, 559 U.S. at 671 (party seeking to vacate an arbitration award "must clear a high hurdle").

**B. FINRA Rule 2040**

Section 15(a)(1) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78o(a)(1), generally requires securities broker-dealers to be registered with the Securities and Exchange Commission (SEC). In accordance with the mandate of § 15(a)(1), Rule 2040(a) generally bars the payment of "any compensation, fees, concessions, discounts, commissions or other allowances" to "any person not registered as a broker-dealer." However, subsection (b) of the rule creates an exception to this barrier for "retiring representatives," as follows:

> (1) A member may pay continuing commissions to a retiring registered representative of the member, after he or she ceases to be associated with such member, that are derived from accounts held for continuing customers of the retiring registered representative regardless of whether customer funds or securities are added to the accounts during the period of retirement, provided that:
>
> (A) a bona fide contract between the member and the retiring registered representative providing for the payments was entered into in good faith while the person was a registered representative of the member and such contract, among other things, prohibits the retiring registered representative from soliciting new business, opening new accounts, or servicing the accounts generating the continuing commission payments; and
>
> (B) the arrangement complies with applicable federal securities laws, SEA rules and regulations.
>
> (2) The term "retiring registered representative," as used in this Rule shall mean an individual who retires from a member (including as a result of a total disability) and leaves the securities industry.

Rule 2040(b).

## III. DISCUSSION

### A. The Parties' Positions

In his opening memorandum, petitioner contends that the Award "should be confirmed in all respects" as it is entitled "great deference" and must be enforced so "long as there is a barely colorable justification for the outcome reached." Pet. Mem. at 1-2 (citations omitted). Petitioner also requests "prejudgment interest of nine percent per annum from December 30, 2025," and "post-judgment interest to run until the judgment is satisfied." *Id.* at 3.

In support of their motion to vacate the Award, respondents argue that this is "one of the rare instances" in which an award should be vacated due to manifest disregard of the law. Resp. Mem. at 1. They contend that because the Award requires them to pay "transaction-based compensation related to an investment banking deal" to an individual "who has not been registered with a FINRA broker-dealer since 2017," it violates Rule 2040. *Id.* In respondents' view, the exception set forth in Rule 2040(b) does not apply to petitioner's claims, because the IRRA "provided for continuing . . . commissions to Mr. Gioupis only for two years after leaving the industry," *id.* at 19, and thus did not authorize Cape to pay him anything in 2024. *Id.* Alternatively, respondents argue, if and to the extent petitioner's right to 85% of the SignalLamp Equity Fee "vested" in 2017 when petitioner was still registered with Cape (or even in 2018, when the stock certificate was issued, which was less than two years after petitioner retired), his claims should have been dismissed as time-barred, because the longest potentially relevant state statute of limitations was six years, but petitioner did not file his arbitration claim until December 2024. *Id.* at 2, 23.

In opposition, petitioner stresses that (as respondents concede) there is "limited caselaw" in the Second Circuit concerning the application of Rule 2040, and argues that respondents "cannot

cite to any decisions, caselaw or any other guiding precedent that supports their entitlement to vacatur of the Arbitration Award with respect to their Rule 2040 argument." Pet. Opp. at 9. Further, petitioner contends, the Panel "could have concluded" that paying him 85% of the cash proceeds that Cape received as a result of the SLH merger was not barred by Rule 2040 for a number of reasons, *see id.* at 11-17, including (for example), on the theory that Cape breached the IRRA by failing to break up the SLH share certificate in 2018, so as to deliver 85% of the shares to petitioner, and that its "continued failure to issue the SLH shares to Mr. Groupis was a continuing breach," thus entitling him to bring his claims in 2024, after respondents refused to deliver 85% of the cash proceeds from those shares. *Id.* at 15-16. Petitioner adds that respondents are unable to offer "a single decision vacating an arbitration award on 'statute of limitations grounds'" because, "under the FAA, 'it is up to the arbitrators, not the court, to decide the validity of time-bar defenses.'" *Id.* at 22 (quoting *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991)); *see also id.* at 23 ("[A]ny determination of statute of limitations issues decided by the Arbitration Panel is beyond the scope of judicial review under the manifest disregard of the law standard.").

In their reply brief, respondents argue that petitioner cannot have it both ways: if he "earned" the claimed commission in 2024, when SLH cashed out its shareholders, "then he would avoid a statute of limitations issue," but any award to him would be barred by Rule 2040. Resp. Reply at 8. If on the other hand, he "earned" the commission in 2017 (before he left Cape) or 2018 (when SLH issued the shares), "then this could have been permitted by FINRA Rule 2040" (if the IRRA were a "bona fide contract that comported with the rule"), but all of petitioner's claims would be time-barred. *Id.*

At oral argument, respondents conceded that there is no caselaw directly analyzing the applicability of Rule 2040 to the fact pattern presented here, but argued that analogous decisions

from this District[4] and from a New York State court[5] make it clear that the payment petitioner seeks is barred by Rule 2040, and therefore that if respondents comply with the Award they will be in violation of § 15(a)(1) of the Exchange Act. Respondents were unable to point to any instance in which a broker-dealer was sanctioned by FINRA (or by any regulatory agency) for complying with a FINRA arbitration award.

**B. Motion to Vacate**

I accept, for purposes of respondents' Motion to Vacate, that "manifest disregard remains a valid ground for vacating arbitration awards." *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011) (quoting *T.Co Metals,* 592 F.3d at 340).[6] I further accept that – at least with respect to their Rule 2040 claim – respondents took pains to make sure that the arbitrators knew about the existence of the rule "and its applicability to the problem before [them]." *Duferco*, 333 F.3d at 389-90. However, respondents have not cleared the "high hurdle," *Stolt-Nielsen*, 559 U.S. at 671, necessary to overcome the deference ordinarily shown to arbitrators on the merits. In particular, respondents have not shown that their interpretation of Rule 2040(b) is "well-defined, explicit, and clearly applicable" to the facts before the arbitrator, *STMicroelectronics*, 648 F.3d at 79, much less "that the panel intentionally defied the law," rather than merely failed to understand or apply it correctly. *Id.* (quoting *Duferco* 333 F.3d at 389). To the contrary: given the lack of

---

[4] *See Schatzki v. Weiser Cap. Mgmt., LLC*, 2016 WL 6662264 (S.D.N.Y. Nov. 9, 2016); *DeVary*, 2024 WL 1309455, at *6.

[5] *See Griffin v. Nat. Securities Corp.*, 2024 WL 3989308, 2024 N.Y. Slip Op. 33064 (N.Y. Sup. Ct. Aug. 28, 2024).

[6] Petitioner somewhat halfheartedly contends that the manifest disregard doctrine "may not be good law." Pet. Opp. at 4 (quoting *Barzelatto v. Spire Sec., LLC*, 2019 WL 8889865, at *7 (S.D.N.Y. Nov. 5, 2019)). However, the Second Circuit spoke definitively to that question in *T.Co Metals*, and continues to apply the doctrine on a regular basis. *See, e.g.*, *Acorda Therapeutics, Inc. v. Alkermes PLC*, 2026 WL 2042719 (2d Cir. July 15, 2026) (summary order).

caselaw on point and the complex factual scenario presented to the Panel, there was "at least a 'barely colorable justification for the outcome reached.'" *DeVary*, 2024 WL 4444280, at *6 (quoting *Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 378 (2d Cir. 2023)).

Reasoning directly from the language of Rule 2040(b), respondents argue that they cannot lawfully pay petitioner any "continuing commissions" out of the cash proceeds that Cape received from SLH in 2024 because petitioner left the firm – and retired from the securities industry – seven years earlier, in 2017, and the IRRA (assuming it was a "bona fide contract" within the meaning of subsection (b)(1)(A)) only permitted them to pay him "continuing commissions" for two years. Resp. Mem. at 12-13, 18-21. Respondents admit, however, that "[t]here have been very few cases in the Second Circuit concerning Rule 2040, and none have addressed the precise issue in this case." *Id.* at 16. Indeed, while the cases that respondents cite engage in various ways with Rule 2040(a) – which generally prohibits commission payments to unregistered persons – they do not even discuss the Rule 2040(b) exception, which permits continuing commission payments to "retiring" registered representatives under various circumstances. *See, e.g.*, *Schatzki*, 2016 WL 6662264, at *5 (determining that payment by individual FINRA member to her non-registered company employer was "specifically prohibited" under Rule 2040(a), without addressing the Rule 2040(b) exception); *DeVary*, 2024 WL 1309455, at *6 (denying motion to vacate arbitration award that required a non-FINRA member to pay damages to a registered broker-dealer, without addressing the Rule 2040(b) retirement exception); *Griffin*, 2024 WL 3989308, at **2, 7 (holding that award denying payment to unregistered individuals was not "wholly irrational," without addressing the Rule 2040(b) retirement exception).

As respondents cannot point to any decision that addresses "the precise issue in this case," Resp. Mem. at 16, they have not shown that the law upon which they rely is "well-defined, explicit, and clearly applicable." *Baker Hughes Energy Servs. LLC v. Int'l Eng'g & Constr. S.A.*, 2021 WL 5331450, at *6 (S.D.N.Y. Nov. 16, 2021) (rejecting respondents' vacatur argument where they did not cite "any binding precedent explicitly holding" the argued outcome, and where "relevant case law [was] ambiguous, which is fatal"); *see also Acorda Therapeutics*, 2026 WL 2042719, at *2 (rejecting vacatur argument where, "[t]ellingly, Acorda has not been able to identify a single case where any court has *ever* held that federal law requires the full repayment of post-expiration royalties"); *Goldman*, 306 F.3d at 1217 (holding that where the law is "unclear," an "arbitral decision cannot be said to have exhibited a manifest disregard of the law"); *STMicroelectronics*, 648 F.3d at 79-81 (affirming denial of manifest disregard claim after considering all cases cited by respondent and finding none relevant).[7]

Nor have they shown that the Panel "intentionally defied the law," *STMicroelectronics*, 648 F.3d at 79; *Duferco*, 333 F.3d at 389, or "intentionally disregarded" the requirements of Rule 2040, as required to succeed on a manifest disregard challenge. *DiRussa*, 121 F.3d at 822. To the

[7] In place of caselaw, respondents presented the Panel with the testimony of a practicing lawyer, Alan Wolper, who provided his own opinion as to the proper interpretation and application of Rule 2040(b) to the facts of this case. *See* Day 3 Tr. at 6-119. Tellingly, at one point during Wolper's testimony, the Chair of the Panel asked whether Cape could have obtained an SEC no-action letter, which would have permitted Cape to make the commission payment to petitioner without fear of an enforcement action by the SEC under § 15(a)(1) of the Exchange Act or related regulations. *Id.* at 117. Wolper responded, in substance, that he did not know what the SEC would have done in response to a no-action letter request: "Sure. Possible. Right. Again, I – if they did, I can't tell you the – there are three possible outcomes as I articulated. The SEC could have not bothered to give them a response, or the SEC could have responded. And if they responded, they would've said, yes, we agree, we'll take no action under these circumstances. Or they said – they might've said, no, we disagree, we will take action." *Id.* It thus appears that even respondents' expert was unsure as to whether the agency charged with regulating the securities industry would view the requested payment to petitioner as a violation of the law.

contrary: the hearing record shows that the arbitrators were alert, engaged, and somewhat skeptical of respondents' interpretation of Rule 2040.[8] Thereafter, they were presented with cogent argument from petitioner's counsel as to why – in petitioner's view – Rule 2040(b) permitted the award he sought.[9] Thus, although "[t]he arbitrators did not state their reasons," (and were not "required to do so"), *id.*, the proper inference – particularly in light of the "strong deference" owed to "arbitral awards and the arbitral process," *Porzig*, 497 F.3d at 138 – is that they agreed with petitioner that Rule 2040(b) permitted Cape to pay petitioner 85% of the cash proceeds it finally obtained – in 2024 – for the illiquid, Class B non-voting shares of SLH that it received as an Equity Fee in 2018.

Moreover, there is – at minimum – a "colorable justification" for that result, particularly given the unusual facts in this case. Petitioner was arguably entitled to 85% of the Equity Fee in January 2018, which is when SLH paid that fee by issuing 209,884 Class B non-voting shares of its stock to Cape. *See* 2d Gilmore Decl. Ex. 2 (SLH share certificate). However, as respondents explain, those shares were illiquid, *see* Resp. Reply at 4, meaning that splitting the share certificate immediately would not have provided either Cape or petitioner with marketable securities. Perhaps for this reason, they did not insist on the issuance of new certificates at that time. Instead, on May 2, 2018, Cape expressly acknowledged that 85% of the SLH shares belonged to petitioner, *see* Pet.

---

[8] *See, e.g.*, Day 1 Tr. at 238-39 (Chairperson posing hypothetical to respondents' attorney concerning license reinstatement scenario and "entitle[ment] to live off the income . . . from the business that I brought into the firm I used to work for[.]"); Day 2 Tr. at 184 (Chairperson asking Webb why respondents did not "write a letter to [petitioner] saying, sorry, pursuant to 2040, we can't pay you"). Day 3 Tr. at 114 (Chairperson questioning respondents' expert regarding "broad" nature of Rule 2040); *id.* at 116 (questioning whether expert would "agree that [the retirement exception] is somewhat broadly written and open to interpretation?").

[9] *See*, *e.g*., Day 3 Tr. at 126 (petitioner's counsel, arguing that "2040 doesn't apply" and that if Cape had been genuinely concerned that paying a commission to petitioner would run afoul of Rule 2040, it would have obtained "an opinion of counsel" or a "no-action letter," rather than hiring an expert "to come in here and tell you why they shouldn't get it paid"); *id.* at 141 (petitioner's counsel, arguing that "there's many reasons, many bases, many grounds under which the panel can award Mr. Gioupis the money" in accordance with Rule 2040(b)).

Hearing Ex. Book 1 at ECF p. 125, and authorized SLH to split the shares, "85% to Paul and 15% to Cape Securities, Inc.," "should a triggering event occur." *Id.* On these facts, the Panel could well have concluded that petitioner became the beneficial owner of 85% of the SLH shares in 2018, and that this transaction was permissible under Rule 2040(b) because it occurred within two years of petitioner's retirement. The Panel could have further concluded that Cape unlawfully converted those shares in 2024 – thus committing a new tort – when it refused to pay petitioner 85% of the cash proceeds it received for the shares as a result of the SLH-Accuhealth merger. *See* Pet. Arb. St. of Claim ¶¶ 11-12 (alleging that the merger was a "triggering event," but that Cape then "misappropriated" his 85% portion of the Equity Fee); *id.* ¶¶ 29-35 (alleging a claim for conversion based upon respondents' "misappropriation" of his portion of the Equity Fee in 2024).

It is well-settled, in our Circuit, that "if 'any justification' can be gleaned from the record, . . . the award must be confirmed." *GMS Grp., LLC v. Benderson*, 326 F.3d 75, 82 (2d Cir. 2003) (affirming confirmation of unreasoned NASD arbitration); *see also D.H. Blair*, 462 F.3d at 110 ("Only a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award.") (cleaned up). Here, there is "at least" such a justification. *DeVary*, 2024 WL 4444280, at *6. Moreover, if respondents "misappropriated" (converted) petitioner's portion of the Equity Fee in 2024 – when, notwithstanding their repeated assurances as to the 85/15 split,[10] they simply kept 100% of the cash flowing from the merger – then respondents' statute of limitations argument also falls away.[11] *See generally Phillips v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

[10] Respondents communicated those assurances as late as June 5, 2024. *See* Pet. Hearing Ex. Book 1 at ECF p. 131 (June 5, 2024 email from Bodner to petitioner confirming that the lion's share of the cash proceeds paid to Cape for the SLH shares would go to petitioner).

[11] Respondents' statute of limitations argument is further weakened by the fact that they did not raise it until the final day of the hearing, during their closing argument, *see* Day 3 Tr. 172, and did not submit any written materials regarding the relevant limitations periods until three days later. *See* Holcomb Decl. ¶ 12 & Ex. HH. As to this issue, therefore, it is not clear whether respondents

2006 WL 3746692, at *5 (D. Conn. Dec. 15, 2006) (confirming award where panel "could have concluded, based on the record evidence," that claims accrued at an earlier time than party moving to vacate had argued).

Since respondents have not met the "high hurdle," *Stolt-Nielsen*, 559 U.S. at 671, to demonstrate that the Panel manifestly disregarded the law, their Motion to Vacate must be denied.

**C. Petition to Confirm**

Because the Court has rejected respondents' grounds for vacatur, petitioner is entitled to confirmation of the Award. *See* 9 U.S.C. § 9 ("[T]he court must grant [an order seeking confirmation] unless the award is vacated, modified, or corrected."); *Spliethoff Transp. B.V. v. Phyto-Charter Inc.*, 2023 WL 6066247, at *3 (S.D.N.Y. Sept. 18, 2023), *aff'd*, 2024 WL 5165511 (2d Cir. Dec. 19, 2024) ("Courts in the Southern District have held that 'upon the denial of a motion for vacatur, the Court must confirm an arbitration award.'") (quoting *Beljakovic v. Melohn Properties, Inc.*, 2012 WL 5429438, at *4 (S.D.N.Y. Nov. 7, 2012), *aff'd*, 542 F. App'x 72 (2d Cir. 2013)). As explained in *Miller v. UBS Fin. Servs. Inc.*, 2019 WL 1988527, at *7 (S.D.N.Y. May 6, 2019) (quoting *L'Objet, LLC v. Samy D. Ltd.*, 2011 WL 4528297, at *3 (S.D.N.Y. Sept. 29, 2011)): "Due to the parallel natures of a motion to vacate and a motion to confirm an arbitration award, denying the former implies granting the latter." The Petition must therefore be granted.

---

properly apprised the Panel of the law's "existence, and its applicability to the problem before them," *Duferco*, 333 F.3d at 389-90; *see also Brit. Ins. Co. of Cayman v. Water St. Ins. Co.*, 93 F. Supp. 2d 506, 521 n.16 (S.D.N.Y. 2000) (where "statute of limitations issue only seem[ed] to have gained saliency upon its development before this Court," it would have been "disingenuous . . . to argue now that the panel was 'aware of' and 'purposefully ignored' a defense that was not squarely presented") (quoting *McCarthy v. Smith Barney, Inc.,* 58 F.Supp.2d 288, 293 (S.D.N.Y.1999)).

**D. Pre-Judgment and Post-Judgment Interest**

Finally, petitioner seeks interest on the Award from the date on which it was issued (December 30, 2025), through the date of judgment in this Court, "at a rate of nine percent per annum under New York State law." Pet. Mem. at 3; *see also* Pet. at 7.

"It is in the discretion of the trial court whether to award pre-judgment interest in an action to confirm an arbitration award, but there is a general 'presumption in favor of prejudgment interest.'" *1199/SEIU United Healthcare Workers E. v. S. Bronx Mental Health Council Inc.*, 2014 WL 840965, at *8 (S.D.N.Y. Mar. 4, 2014) (quoting *Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd.,* 737 F.2d 150, 154 (2d Cir.1984)); *see also Constr. Council 175, Util. Workers of Am., AFL-CIO v. New York Paving, Inc.*, 708 F. Supp. 3d 221, 233-34 (E.D.N.Y. 2023) ("The Second Circuit recognizes a presumption in favor of pre-judgment interest for arbitration awards."). "Prejudgment interest is appropriate where the agreement between the parties states that an arbitration decision is final and binding." *First Cap. Real Est. Invs., L.L.C. v. SDDCO Brokerage Advisors, LLC*, 355 F. Supp. 3d 188, 197 (S.D.N.Y.), *aff'd sub nom.*, *First Cap. Real Est. Invs., LLC v. SDDCO Brokerage Advisors, LLC,* 794 F. App'x 86 (2d Cir. 2019). "The 'common practice' among courts within the Second Circuit is to grant interest at a rate of nine percent, the rate of prejudgment interest under New York State law." *Id.* (quoting *SEIU v. Stone Park Assocs., LLC*, 326 F. Supp. 2d 550, 550 (S.D.N.Y. 2004)); *accord Constr. Council 175*, 708 F. Supp. 3d at 234; *see also* N.Y. C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum.").

In this case, the parties' underlying contract states that any arbitration award "shall be final." IRRA ¶ 22. Moreover, respondents do not contest petitioner's right to pre-judgment interest if the Award is confirmed. For these reasons, and in light of the presumption in favor of awarding pre-

judgment interest, petitioner will be awarded pre-judgment interest on the principal amount of the Award ($528,795.49) at a rate of nine percent per annum, from December 30, 2025, until judgment is entered in this case.

Petitioner also seeks post-judgment interest. *See* Pet. at 7; Pet. Mem. at 3. "'The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered,' including orders that confirm arbitration awards." *Trs. of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus. Fund v. Safeway Installation Corp.*, 2023 WL 2596939, at *4 (S.D.N.Y. Mar. 22, 2023) (quoting *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996)). Petitioner is therefore "entitled to post-judgment interest from the date of entry of the Court's judgment, at the rate provided for by 28 U.S.C. § 1961." *Id.*; *accord Trs. of New York City Dist. Council of Carpenters Pension Fund v. Megrant Corp.*, 2026 WL 252510, at *8 (S.D.N.Y. Jan. 30, 2026).

## IV. CONCLUSION

For the reasons set forth above, the Motion to Vacate (Dkt. 8) is DENIED, the Petition (Dkt. 1) is GRANTED, and the Award is CONFIRMED. Petitioner is entitled to $528,795.49, plus prejudgment interest at the rate of nine percent per annum, calculated from December 30, 2025 until the date on which judgment is entered. Thereafter, petitioner will be entitled to post-judgment interest at the rate provided for by 28 U.S.C. § 1961.

The Clerk of Court is respectfully directed to terminate the motion at Dkt. 8, enter judgment in accordance with this Opinion and Order, and close this case.

Dated: New York, New York
September 30, 2026

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**